UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**COLUMBUS CENTRAL OHIO**
**BUILDING AND CONSTRUCTION**
**TRADES COUNCIL, AFL-CIO,**

    **Plaintiff,**

    v.

**COLUMBUS REGIONAL**
**AIRPORT AUTHORITY,** *et al.***,**

    **Defendants.**

Case No. 2:24-cv-4230
**JUDGE EDMUND A. SARGUS, JR.**
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss for Lack of Jurisdiction filed by Defendants Columbus Regional Airport Authority and Chief Ronald Gray in his official capacity (collectively, the "Airport Authority"). (ECF No. 15.) Plaintiff Columbus Central Ohio Building and Construction Trades Council, AFL-CIO ("Council") filed a response in opposition to the Motion. (ECF No. 18.) Defendants did not reply, and the time to do so has passed. For the reasons stated in this Opinion and Order, the Motion to Dismiss (ECF No. 15) is **DENIED**.

## BACKGROUND

This case arises from a labor dispute between the Council and the Airport Authority over the construction of a new terminal at the John Glenn International Airport. The Council seeks to picket in connection with the dispute near the construction site but contends the Airport Authority's policy governing protesting activity unlawfully prohibits it from doing so.

**I.**     **The Council unsuccessfully sought to negotiate a Community Benefits Agreement with the construction company before construction of the new terminal began.**

The Airport Authority is responsible for the construction of the new terminal at the John Glenn International Airport. The project is estimated to cost upwards of $2 billion and require

extensive labor. (Am. Compl., ECF No. 13, ¶ 9.) The Airport Authority hired Hensel Phelps Construction Company as the construction manager to oversee the project. (*Id.* ¶ 10.)

In the summer of 2023, the Council, which represents several local labor unions and construction workers, sought to negotiate a Community Benefits Agreement ("CBA") with Hensel Phelps before construction of the terminal began. (*Id.* ¶ 11.) The Council wanted to promote the use of a local and diverse workforce, and guarantee that all construction workers—regardless of which contractor employed them—received equal rights, fair wages, health, and retirement benefits, and access to grievance and arbitration procedures. (*Id.*)

But Hensel Phelps proposed a CBA that allowed contractors to opt out of the CBA. (*Id.* ¶ 12.) In other words, Hensel Phelps' proposal would not require all contractors to guarantee certain rights to their workers. (*Id.*) The Council would not agree to the proposal. (*Id.*) It lobbied the Airport Authority to intervene on its behalf in the negotiations. (*Id.* ¶ 14.)

A representative from the Airport Authority attended multiple negotiation sessions but did not intervene on the Council's behalf. (ECF No. 13, ¶ 20.) Hensel Phelps then sent a new proposal that exempted all disadvantaged and diverse businesses from the CBA. (*Id.* ¶ 15.) According to the Council, the exemption left workers employed by diverse businesses without the protections afforded to employees of non-diverse businesses. (*Id.* ¶¶ 16–18.) And the new proposal also conflicted with the Airport Authority's goal to have 25% participation by disadvantaged and diverse business groups, says the Council. (*Id.* ¶ 19.) The parties last negotiated in May 2024, but when no agreement was reached, the new terminal's construction moved forward without a CBA. (*Id.* ¶¶ 21–23.)

  **II.** **The Council planned to protest the groundbreaking ceremony.**

Frustrated that construction of the new terminal was proceeding without a CBA, the Council organized a demonstration to coincide with the Airport Authority's groundbreaking

ceremony on December 9, 2024. (ECF No. 13, ¶ 23.) At the demonstration, the Council intended to display a large inflatable rat, known as "Scabby the Rat," and a banner held by four people. (*Id.* ¶ 25.) Adhering to the Airport Authority's Policy governing picketing, leaflet, and literature distribution, the Council applied for a permit to conduct the demonstration on November 25, 2024. (*Id.* ¶ 26.)

### III. The Airport Authority's Policy governing First Amendment activity.

Along with a requirement that organizations obtain permits before engaging in picketing, leafleting, or literature distribution, the Airport Authority's Policy includes additional time place and manner restrictions. (*See* ECF No. 13-1, PageID 106–112.) The Policy states that the Airport is not a public forum for First Amendment purposes. (*Id.* PageID 106.) To engage in a demonstration, the party must apply for a permit at least seven days, but no more than 30 days, before the demonstration is scheduled to begin. (*Id.* PageID 107.) The Airport Authority's "[f]ailure to issue a permit within seven (7) business days shall constitute a denial." (*Id.* PageID 108.) A person or organization can only obtain a permit to engage in picketing, leafleting, or literature distribution in the four designated areas, shown in red below:




3

(*Id.* PageID 111–12.) According to the Airport Authority, these areas are the only areas that provide a "reasonable opportunity for leafleting without excessively disrupting pedestrian and vehicular traffic." (*Id.* PageID 106.)

In addition to limiting where demonstrations can occur, the Policy also limits the number of participants (four), the number of days the protest can last (no more than seven consecutively), and the materials that can be used (no tables, chairs, or wheeled or stationary devices). (*Id.* PageID 106–110.) Any materials, leaflets, or literature must be submitted for approval at least 72 hours before the demonstration. (*Id.* PageID 107.)

A permit can be revoked or denied if the materials display or distribute content that "(i) is disruptive to air travel; (ii) instill fear in the traveling public regarding air travel; or (iii) is pornographic." (*Id.* PageID 108.) Safety concerns, or concerns that an activity interferes with the operations of the airport, are also grounds to revoke or deny a permit. (*Id.*)

Last, as it relates to labor disputes, the Policy provides:

> For labor disputes between any employer occupying any part of the Airports, and any employees who are organized in a collective bargaining unit, alternate picketing areas may be authorized as necessary in order that the labor dispute not hinder or prevent the lawful work or employment of persons other than such employer, and that the same will not tend to induce violence, cause of a breach of the peace or other unlawful conduct, or obstruct or interfere with free and uninterrupted use of said premises by other tenants or occupants by other persons lawfully using the Airport.

(*See* ECF No. 13-1, PageID 107.)

### IV. The Council sought emergency relief from this Court to obtain a permit to protest.

After the Council applied for a permit, several days passed without word from the Airport Authority as to whether the Council would be issued a permit to demonstrate at the groundbreaking ceremony. (ECF No. 13, ¶¶ 26–28.) Concerned that its application would effectively be denied when the Airport Authority failed to issue a permit within seven business days, the Council sought

4

emergency relief from this Court by filing this lawsuit and moving for a temporary restraining order on December 4, 2024. (*See* ECF Nos. 1, 5.) The Council moved to enjoin the Airport Authority from interfering with its right to protest during the groundbreaking ceremony. (*See id.*)

On December 7—the last day for the Airport Authority to issue a permit—the Court held a mediation with the parties. (ECF No. 7 (Minute Entry).) During the mediation, the Airport Authority agreed to allow the Council to have ten persons protest by holding a stationary banner near the entrance of the parking lot where the groundbreaking ceremony would take place. (*Id.*; *see also* ECF No. 13, ¶ 31.) The Airport Authority also permitted the Council to display "Scabby the Rat" outside of the passenger terminal during the ceremony. (*Id.*) In exchange, the Council withdrew its motion for temporary restraining order and conducted the demonstration on December 9, 2024. (*See* ECF No. 12.)

**V.      The Council amended the Complaint to challenge the Airport Authority's Policy governing protests moving forward.**

After the demonstration, the Council filed an Amended Complaint asserting that the Policy continues to infringe on its members' First Amendment rights. (*See* ECF No. 13.) The Amended Complaint alleges that the Council plans to engage in future demonstrations at three sites around the Airport. (*Id.* ¶ 33.) No location overlaps with the designated picketing areas permitted under the Airport Authority's Policy. (*Id.* ¶¶ 37, 44–48.)

The first area, referred in the Amended Complaint to as "Free Speech Activity Site 1," is next to several hotels and restaurants along the international gateway and includes the "public roads, sidewalks, and grassy areas that are freely accessible to the public" with "publicly accessible features." (*Id.* ¶¶ 44–46.) The second site, referred to as "Free Speech Activity Site 2," is the right of way near the "new terminal construction gate locations through which construction workers and contractors pass." (*Id.* ¶ 47.) The third location, "Free Speech Activity Site 3," includes the

"sidewalks near entrances and exits adjacent to the existing airport terminal that can easily accommodate more than four picketers and four handbillers without any impact on airport operations." (*Id.* ¶ 48.) The Council intends to peacefully engage in expressive activity critical of the Airport Authority at the first and third sites. (*Id.* ¶¶ 34, 50.) In the event of a labor dispute, the Council intends to engage in expressive activity at the second site. (*Id.* ¶¶ 33, 50.)

The Council asserts that all three sites are traditional public forums. (*See id.* ¶¶ 51–63.) Because the Policy prohibits it from engaging in free speech at those sites, the Policy violates the First Amendment and Article I, Section 3 of the Ohio Constitution, says the Council. (*Id.*)

## STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). "It is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted). Federal subject matter jurisdiction "can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

A court may dismiss an action under Rule 12(b)(1) when it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3) (requiring courts to dismiss an action "at any time" for lack of subject matter jurisdiction). When a defendant challenges a complaint on its face under this rule, as the Airport Authority does here, the defendant challenges "the sufficiency of the pleading itself." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id.* "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996).

6

## ANALYSIS

The Council seeks a declaration that the Airport Authority's Policy violates the rights of its members under the First Amendment and the Ohio Constitution. (*See* ECF No. 13.) The Airport Authority argues that the Amended Complaint should be dismissed because the Council cannot show that it, or its members, suffered an injury caused by the Airport Authority to have standing to assert its claims. (ECF No. 15, PageID 121.) The Council contends that it may bring a pre-enforcement challenge on behalf of its members because the Policy created an objective chilling effect that constitutes an injury in fact. (ECF No. 18, PageID 146.)

The Constitution only gives federal courts authority to decide "cases" and "controversies." U.S. Const. art. III. § 2. To have a genuine case or controversy, a plaintiff must have a personal stake in the outcome of the dispute. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "In other words, a plaintiff must have standing." *Associated Builders & Contractors of Mich. v. Cowen*, No. 23-1803, 2025 U.S. App. LEXIS 3586, at *7 (6th Cir. Feb. 13, 2025).

"[An] association has standing to bring a suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The first requirement—whether the Council's members would have standing to sue in their own right—is at issue.

A plaintiff lacks standing unless they: (1) "suffered an injury in fact" that is actual or imminent, (2) "fairly traceable to the challenged conduct of the defendant," and (3) "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The party invoking federal jurisdiction—here, the Council—must allege facts establishing each

element of standing. *Id.* But at the motion to dismiss stage, mere allegations as to each element are sufficient to survive a standing challenge. *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016).

> **I.    The Council has adequately alleged an injury in fact to have standing.**

An Article III injury must be "actual or imminent, not speculative." *All. for Hippocratic Med.*, 602 U.S. at 381. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Normally, this means that "the injury must have already occurred." *All. for Hippocratic Med.*, 602 U.S. at 381. For example, when the government enforces an allegedly unconstitutional law against the challenging party. *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024).

But in some cases, a future injury can confer standing if it is "certainly impending" or if there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "Standing can derive from an imminent, rather than an actual, injury, . . . only when the threatened injury is real, immediate, and direct." *Crawford v. United States Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (internal quotations omitted). A future injury that is merely "possible" is not enough to constitute an injury in fact. *Id.* at 454–55 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–16 (2013)). Although a "somewhat elastic concept," imminence should not be "stretched beyond its purpose" of ensuring that "the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409.

A governmental activity that chills or deters the exercise of First Amendment rights can cause an injury in fact. *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (collecting cases). The activity must be "regulatory, proscriptive, or compulsory in nature," and the plaintiff must be "either presently or prospectively subject to the regulations, proscriptions, or compulsions" challenged. *Id.* To have

standing the "litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008).

To ensure an injury is imminent in the pre-enforcement context, the Sixth Circuit imposes further requirements. *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024). The plaintiff must demonstrate (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is proscribed by the statute or regulation at issue, and (3) the threat of future enforcement is "certainly impending." *Susan B. Anthony List*, 573 U.S. at 160–62; *see also McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012) (citation omitted).

### A. The Council sufficiently alleges that its members intend to engage in the conduct affected with a constitutional interest and proscribed by the Policy.

The Council asserts that it intends to continue to protest around the John Glenn International Airport to criticize the fact that the new terminal construction project is proceeding without a CBA in place. (ECF No. 18, PageID 147.) It intends to engage in such protests spontaneously—without waiting at least seven days for the Council to reject its permit application—and to do so outside the permissible areas. (*Id.*; *see also* ECF No. 13, ¶¶ 33, 44–50.)

The First Amendment broadly provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The freedom of speech includes the right to protest and picket. *See*, *e.g.*, *Carey v. Brown*, 447 U.S. 455, 466 (1980) (describing public issue picketing as "an exercise of . . . basic constitutional rights in their most pristine and classic form"). And the Sixth Circuit has concluded that "the use of a [Scabby the Rat] balloon to publicize a labor protest is constitutionally protected expression within the parameters of the First Amendment." *Tucker v. City of Fairfield*, 398 F.3d 457, 462 (6th Cir. 2005) (citation omitted) (elaborating that Scabby the

9

Rat is symbolic of the labor union's message). Thus, the Council has shown that it intends to engage in a course of conduct that is affected with a constitutional interest.

The Policy proscribes the Council's intended course of conduct. To start, the Airport Authority requires that an organization planning to protest apply for, and receive, written permission to do so in the form of a permit. (ECF No. 13-1, PageID 107.) A permit will only be provided if the demonstration occurs in certain areas designated by the Airport Authority. (*Id.* PageID 106–10.) The Policy authorizes the Airport Authority to deny a permit application by taking no action for seven business days, without issuing a formal denial or providing any explanation. (*Id.* PageID 107.) This waiting period precludes the Council from spontaneous protesting, picketing, or the distribution of literature.

In *McGlone*, requiring a student to give notice and restricting his speech to certain areas on his college campus was sufficient to establish the university's policy objectively chilled his expression. *McGlone*, 681 F.3d at 730. The student's standing was not diminished because he could speak freely in other parts of the campus, said the Sixth Circuit. *Id.* (citing *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 607 (6th Cir. 2005) (allowing a challenge of a permit provision even though the city provided ample alternative means of communication)).

In the same way, the permit requirement restricts the Council's ability to engage in spontaneous expressive activity. That the Council may protest near the passenger terminal, instead of the constructions site, does not undermine its standing. Its prior protest activity confirms that its intent is genuine and concrete, rather than speculative.

### B. The Council alleged a credible fear of future enforcement.

The Council has also shown a credible threat of future enforcement to establish that its injury is sufficiently imminent for Article III standing. Courts analyze whether a threat of future enforcement is certainly impending, and thus credible, holistically, under the four *McKay* factors:

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*McKay*, 823 F.3d at 869 (citations omitted). These factors "are not exhaustive, nor must each be established." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (explaining that the Sixth Circuit has found standing where "some combination of the factors are present").

The record does not show that the Council received a warning letter about its picketing activity, or that the Policy can be enforced by a private party, so the second and third factors are neutral. *See McKay*, 823 F.3d at 869 (defining factors (2) and (3)). But the Council has plausibly alleged that first and fourth factors support its standing to assert its pre-enforcement challenge.

The Council's concern about enforcement is well-founded: the Airport Authority has tried to use its Policy to restrict the Council's speech. *See Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (explaining that an injury is more concrete when the same conduct has drawn enforcement in the past). Despite the Council's request, the Airport Authority never issued the Council a permit to protest the groundbreaking ceremony. (ECF No. 18, PageID 147.) It acquiesced and agreed to limited concessions only after the Council sought emergency injunctive relief and engaged in "eleventh-hour negotiation[s] at the courthouse." (*Id.*) This history thus substantiates the Council's concern that the Policy may again be invoked to restrict its picketing activity, reinforcing the chilling effect. (*Id.*)

11

The Airport Authority has not disavowed enforcement of the Policy against the Council. Its silence lends credibility to the Council's argument: by refusing to disclaim future enforcement, the Airport Authority renders the Council's fear of enforcement more credible. *See Ream v. United States Dep't of the Treasury*, 771 F. Supp. 3d 998, 1009 (S.D. Ohio 2025) (finding the government's argument that it had not yet decided whether to enforce a challenged statute unpersuasive because silence is not a disavowal).

The Airport Authority cites *Davis v. Colerain Twp.*, 51 F.4th 164, 172–73 (6th Cir. 2022) in the Motion to Dismiss. (ECF No. 15, PageID 122.) There, the plaintiff challenged the township's policy restricting inappropriate or offensive comments on the police department's social media pages. *Id.* On a motion for summary judgment, the Sixth Circuit held that the plaintiff had not established an imminent future injury because it was not clear that the that the police department would apply the restriction against her. *Id.*

*Davis* is distinguishable. For one, the *Davis* plaintiff did not show any past enforcement, as the Council does here. *Davis*, 51 F.4th at 172–73. And the plaintiff only expressed a "wish" to make comments on social media in the future, but did not specify what those comments would be or how they were proscribed by the township's policy. *Id.* Most significantly, the Sixth Circuit reviewed the plaintiff's standing on a motion for summary judgment, where the plaintiff's burden to establish standing is higher than on a motion to dismiss. *Id.* at 171 (comparing the plaintiff's burden to plausibly allege standing on a motion to dismiss from the burden to present enough evidence to create a genuine issue of material fact on each element at summary judgment).

Viewing the *McKay* factors holistically, considering the standard on a motion to dismiss, the Court finds that the Council has plausibly alleged the injury-in-fact element for Article III standing. The Council has shown a certainly impending threat of enforcement and that the

12

enforcement of the Airport Authority's Policy would objectively chill the rights of its members under the First Amendment.

II. **The Council plausibly alleged its injury was caused by the Policy and that its injury would be redressed by the relief sought.**

After establishing an injury in fact, the Council must show that its injury is "fairly traceable to the challenged conduct" and that a favorable judicial decision would redress the alleged harm. To show traceability, "there must be a causal connection between the injury and the conduct complained of" and "not [the] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotations omitted). "Beyond that threshold, however, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 592 (6th Cir. 2022) (quotation omitted). "Any harm flowing from the defendant's conduct, even indirectly, is said to be fairly traceable." *Id.*

As discussed above, the Council complains that the Policy has a chilling, or deterrent effect, on its members' exercise of their First Amendment rights. The Policy prevents the Council from demonstrating spontaneously by requiring it to obtain a permit. It also restricts where demonstrations can occur and prevents the Council and its members from picketing near the construction site of the new terminal. Enforcement of the Policy will thus limit the Council's, and its members', ability to engage in its intended First Amendment activity.

Again, the Airport Authority does not respond to the Council's arguments. It simply argues that because the Council cannot show injury, the Council cannot trace the nonexistent injury to the Airport Authority's conduct. But this argument is not persuasive. The Council has met its modest burden of showing a causal connection between its injury and the Policy. The second element of standing is thus plausibly alleged to survive the Motion to Dismiss.

To redress its injury, the Council askes the Court to issue a permanent injunction prohibiting the Airport Authority from enforcing the Policy or otherwise interfering with the Council's rights to assemble and engage in activity protected by the First Amendment and Ohio Constitution. (ECF No. 13, PageID 104.) Granting the requested relief, and declaring the Policy unconstitutional, would enable the Council to demonstrate and picket freely, thereby eliminating any objective chill on its members' freedom of speech.

The Council has therefore plausibly alleged each element of standing—injury, causation, and redressability—and possesses standing to facially challenge the Policy. Accordingly, the Motion to Dismiss fails. This holding does not address the merits of the Council's claims, and the Airport Authority may renew its standing arguments at the summary judgment stage.

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss (ECF No. 15) is **DENIED**. This case remains open.

**IT IS SO ORDERED.**

**9/24/2025**  **s/Edmund A. Sargus, Jr.**
**DATE**  **EDMUND A. SARGUS, JR.**
  **UNITED STATES DISTRICT JUDGE**